UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| OSCAR L. HAMPTON III | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No.** |
| | ) | |
| **JULIE SU** | ) | |
| **ACTING SECRETARY OF LABOR,** | ) | |
| **U.S. DEPARTMENT OF LABOR** | ) | |
| **200 Constitution Ave. NW** | ) | |
| **Washington, DC 20210** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

-----------------------------------------------------------

EMPLOYMENT DISCRIMINATION COMPLAINT AND
DEMAND FOR JURY TRIAL

Plaintiff Oscar L. Hampton, III, Esq. by and through his undersigned counsel, hereby

brings this civil action against Julie Su, Acting Secretary of Labor, U.S. Department of Labor

("DOL" or the "Agency") in her official capacity only, and alleges as follows:

Introduction and Summary

1.  Plaintiff Oscar L. Hampton, III, Esq. is one of the DOL's top litigators.  In May 2023, he

    **won the highest jury verdict in DOL's history.** In his role as the Regional Solicitor for

    DOL's Region III, he achieved monumental successes for DOL. In the past two years alone,

    **Mr. Hampton recovered more for America's workers than all the other DOL regions**

    **combined.**

2.  Mr. Hampton's excellent performance and dedication to DOL's mission were not enough to

    protect him from discrimination at DOL. Mr. Hampton is a Black man, and one of the only

1

Black attorney managers in the entire DOL nationwide.

3. Throughout his employment, DOL subjected Mr. Hampton to race discrimination and ratified harassing and discriminatory conduct by Mr. Hampton's subordinates.

4. As alleged herein, certain White attorneys supervised by Mr. Hampton targeted Black managers including, but not limited to Mr. Hampton, with racist and biased complaints predicated on racial tropes. For example, some of these White employees complained that Mr. Hampton was "overbearing," "intimidating," and "aggressive." Mr. Hampton repeatedly complained to DOL about the harassment and discrimination that he and other Black attorneys experienced.

5. Matters worsened when, on or around March 2021, DOL appointed Stanley Keen to one of the most senior roles in the DOL, where he served as Mr. Hampton's direct supervisor. Mr. Keen had a known reputation for animus towards Black attorneys and their complaints.

6. As a result, select White employees who had long harbored discriminatory animus towards Mr. Hampton because of his race, now had a new audience for their unfounded and biased complaints. Mr. Keen unquestioningly accepted the complaints against Mr. Hampton, including when they had explicitly racist language, such as **referring to the Black managers who worked under Mr. Hampton as Mr. Hampton's "flying monkeys**."

7. Under Mr. Keen's leadership, DOL discriminated against Mr. Hampton by, including but not limited to, publicly removing Mr. Hampton from his position, and ordering him not to contact his employees, and launching unfounded, discriminatory investigations into Mr. Hampton. DOL ignored evidence, including the explicit testimony and/or complaints of numerous employees that Mr. Hampton was being subjected to racist discrimination, and instead made unfounded adverse findings against Mr. Hampton.

8.  This Complaint challenges unlawful retaliation, sex, color, and race discrimination committed against Plaintiff Oscar L. Hampton, III by his managers and supervisors at the U.S. Department of Labor Solicitor's Office (SOL), a sub-agency within DOL, for DOL's discrimination against Mr. Hampton, including removing him from his position, proposing his removal from federal service, subjecting him investigations, making false and/or unsubstantiated allegations against him, interfering with his ability to carry out his duties on behalf of DOL, and tarnishing his professional reputation. DOL's discriminatory actions not only harm Mr. Hampton, but also harm the Agency and the nation workers that DOL has a fiduciary responsibility to protect.  This lawsuit seeks relief for unlawful race and sex discrimination, and unlawful retaliation, in violation of Title VII, 42 U.S.C. § 2000e-1 *et seq.*

**Venue, Jurisdiction and Exhaustion**

9.  This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1, *et seq.*

10.  Venue lies in this Court pursuant to 42 U.S.C. Sec. 2000e-5(f) and 28 U.S.C. Sec. 1391(b)(2) because this is the jurisdiction in which a substantial part of the events or omissions giving rise to the claim occurred.

11.  The DOL issued Mr. Hampton a Final Agency Decision on October 25, 2023. This Complaint is being filed within 90 days of the receipt of the Final Agency Decision, pursuant to Title VII, 42 U.S. Code § 2000e–16(C).

12.  All statutory prerequisites for bringing this action have been timely satisfied.

13.  At the time of this filing, Plaintiff filed a new Formal Complaint of Discrimination regarding DOL's recent discriminatory actions, including the DOL's decision to officially remove Mr. Hampton from federal service. DOL notified Mr. Hampton that DOL was terminating his

employment at 4:06 PM on Sept. 12, 2023, effective as of 5:00 PM on the same day. After these claims have been exhausted in the administrative process, Plaintiff intends to amend this Complaint to include these claims.

## The Parties

14.   Plaintiff Oscar L. Hampton III is an adult resident of Pennsylvania. At all relevant times, Mr. Hampton was an employee of the DOL. Mr. Hampton began his career with DOL in 1989 as a Trial Attorney, and served as the Regional Solicitor of DOL Region III from 2014, until DOL issued him a discriminatory "Notice of Detail and No Contact Order" on Nov.10, 2022, removing him from his position. From Nov. 10, 2022 until his wrongful termination, Mr. Hampton's work station for Defendant was at DOL's Front Office in Washington, DC. DOL terminated his employment at 4:06 PM on Sept. 12, 2023, effective as of 5:00 PM on the same day. At all relevant times, Plaintiff was an employee of Defendant's within the meaning of Title VII.

15.   Defendant, Julie Su, Acting Secretary of Labor, U.S. Department of Labor in her official capacity only, is currently the acting head of a Federal Agency of the United States, which employed Plaintiff. DOL is headquartered in Washington, DC. One of the divisions of DOL is the Office of the Solicitor of Labor ("SOL"), a sub-division of DOL, to which Congress granted the authority to litigate cases to enforce workplace laws, such as the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., and Executive Order 11246, which prohibits discrimination on contracts with the federal government. SOL is headquartered in Washington, DC. SOL has seven regional and seven branch offices which serve as lower court trial litigation centers. The regional offices are headed by Regional Solicitors and Deputy Regional Solicitors; each branch office is headed by an Associate Regional Solicitor.

The Regional Solicitors have independent litigation authority and initiate litigation on behalf of the regional clients.  The regional offices provide trial litigation and general legal services to DOL, and aid regional officials in carrying out their responsibilities. The regional offices recommend and prosecute litigation at the administrative and District Court trial levels, prepare legal interpretations and opinions, and assist the United States Attorney in the prosecution of criminal cases. At all relevant times, Defendant was Plaintiff's employer under the meaning of Title VII.

### Mr. Hampton's Background

16.    DOL hired Mr. Hampton as a Trial Attorney in February 1989. Since then, DOL repeatedly promoted Mr. Hampton. During his career with DOL, Mr. Hampton also served as Senior Trial Attorney, Region VII Occupational Safety and Health Counsel-SOL; as the Acting Area Director of the Occupational Safety and Health Administration (OSHA), Overland Park, KS; and as a Special Assistant United States Attorney.  In 2014, DOL promoted Mr. Hampton to the role of Regional Solicitor for Region III.

17.    Prior to joining DOL, Mr. Hampton served as a Trial Attorney for the Equal Employment Opportunity Commission (EEOC) where he tried federal district court cases and represented the EEOC in numerous evidentiary hearings.

18.    Mr. Hampton holds Bachelor of Science and J.D. degrees from the University of Missouri-Columbia Missouri School of Arts and Science and Law School, where he was the first Black male student to be nominated by the University for the prestigious President Harris S. Truman Scholar Award.

### Mr. Hampton's Performance and Accomplishments

19.    Mr. Hampton was highly qualified and excelled in his work with DOL.

5

20.    As the Regional Solicitor for Region III in SOL, Mr. Hampton was responsible for overseeing civil trial litigation and legal support for matters arising in the District of Columbia, Delaware, Maryland, Pennsylvania, Virginia, and West Virginia, as well as overseeing the Region's work in preparing legal interpretations and opinions, and assisting the United States Attorney in the prosecution of criminal cases.

21.    Throughout Mr. Hampton's legal career he has personally tried and/or supervised the prosecution of thousands of cases on behalf of the nation's workers.  As a DOL Trial Attorney he personally tried over a hundred cases recovering millions in back wages, fines, and penalties.  As a DOL Senior Trial Attorney he personally obtained or assisted local United States Attorneys and their staff in obtaining numerous convictions of employers and their agents for violation of the criminal provisions of Occupational Safety and Health Act.

22.    Under Mr. Hampton's leadership, Region III has been **one of the highest performing regions, recovering over $100 million dollars in wages and damages for over 20,000 employees in the last two fiscal years, more than all the other DOL regions combined.**

23.    Under Mr. Hampton's leadership, Region III tried numerous federal district court cases. His office has won every federal district court case that it tried during his tenure except for one, which resulted in a post judgement recovery of over 4 million dollars.

24.    In addition, under Mr. Hampton's leadership, Region III won hundreds of cases pursued in administrative tribunals recovering tens of millions in penalties and fines.

25.    Recently, Mr. Hampton was lead counsel in the highly publicized case *Julie A. Su, Acting Secretary of Labor, U.S. Department of Labor v. East Penn Manufacturing Company*

*Inc.,* where he obtained a $22 million dollar verdict in unpaid overtime for thousands of workers. According to DOL, this is the **largest recorded FLSA jury verdict in the entire history of DOL.**

26. After Mr. Hampton led his office to the biggest jury verdict in the history of the DOL, a DOL District Director for Wage and Hour wrote the following message praising Mr. Hampton and his team:

> Thank you for the kind words. I have been a District Director since 2005. **Over the years, I sat here and seethed when RSOL, too fearful to act, rejected one great case after another.**
>
> **That all changed when Oscar arrived. His intelligence, tenacity, fearlessness, dedication, and work ethic have been exemplary. The workforce in the northeast region is the beneficiary**.
>
> My district office staff, especially Jason, may have worked very hard, but **our efforts were exceeded by those of Oscar and all you all**. I want to thank Oscar, Elizabeth, Alex, Sam, you, and your team for taking on a billion dollar company with infinite resources and winning. We took on Goliath and won.

(emphasis added).

27. After Mr. Hampton's historic victory in the *East Penn* case, on May 12, 2023 Solicitor of Labor, Seema Nanda wrote an email to the entire Solicitor's Office stating "**We believe this is the largest jury trial verdict ever obtained by the Department under the Fair Labor Standards Act.** This impactful case was the result of five years of litigation, intense and voluminous motion practice, thirty workdays of trial before a jury, hours upon hours of intense legal work and support." (emphasis in original). In addition Solicitor Nanda further stated, "**I and the rest of the Front Office want to acknowledge and express our appreciation for the immediate trial team who regularly appeared in court:  Regional Solicitor Oscar Hampton III, who led the team, Elizabeth (Liz) Kuschel, Alexander Gosfield, and Wage Hour Counsel Adam Welsh.**" (emphasis in

original). Solicitor Nanda further stated in her thank yous that "If you weren't working directly on this case, you shouldered burdens that allowed the others to focus on this important mission," and that "Every day SOL accomplishes major results to support the Department's mission of protecting America's workers.  As you go into the weekend, I wanted to express my deep appreciation to all of you for your dedication to the work."

28.     Mr. Hampton's exceptional accomplishments for DOL stand out at a time when DOL has faced scrutiny for weak enforcement efforts and reduced recoveries for workers. DOL's data for fiscal year 2021 showed that DOL recovered the lowest amount of back wages in a decade. The U.S. Government Accountability Office (GAO) published a report which criticized DOL for its inconsistent enforcement efforts, which also reflected that Philadelphia and San Francisco Regions had strong enforcement efforts.

29.     Mr. Hampton has received superior or outstanding ratings (the highest ratings DOL gives to employees), until Stanley Keen became his supervisor.

30.     In his thirty-seven years with the Department Mr. Hampton was never subjected to discipline by DOL until the events detailed in this Complaint.

**Policies Governing Mr. Hampton's Employment at DOL**

31.     DOL is required to follow Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e-1, *et seq.* Title VII makes it unlawful to discriminate against employees on the basis of their race, and/or sex, and make it unlawful to retaliate for making complaints about any of the above. Title VII requires employers to investigate and take remedial action regarding any allegations of discrimination and/or retaliation the employer is on notice about.

32.     Pursuant to 29 C.F.R. § 1614.102, as a federal agency, DOL is required to "maintain a continuing affirmative program to promote equal opportunity and to identify and

eliminate discriminatory practices and policies;" "Conduct a continuing campaign to eradicate every form of prejudice or discrimination from the agency's personnel policies, practices and working conditions;" "Review, evaluate and control managerial and supervisory performance in such a manner as to insure a continuing affirmative application and vigorous enforcement of the policy of equal opportunity, and provide orientation, training and advice to managers and supervisors to assure their understanding and implementation of the equal employment opportunity policy and program;" and "Take appropriate disciplinary action against employees who engage in discriminatory practices."

33. Pursuant to the NO FEAR Act, 5 C.F.R. § 724 *et. seq.,* DOL was obligated to affirmatively notify and ensure all employees, including Mr. Hampton, that they would not face retaliation for raising complaints of discrimination.

34. Pursuant to a letter issued by former Secretary of Labor Marty Walsh to all DOL Employees, DOL has a "policy of maintaining a work environment that is free from any form of discriminatory harassment," which DOL defined as "any activity that creates an intimidating, hostile, or offensive work environment, or unreasonably interferes with an individual's work performance, and is related to a person's gender, age, race, color, religion, national origin, disability, gender identity, sexual orientation, status as a parent, or any other impermissible factor. Any conduct constituting discriminatory harassment will not be tolerated." The Memorandum informed employees that the "DOL treats all allegations of discriminatory harassment seriously and will conduct appropriate follow-up and take immediate and appropriate corrective and/or disciplinary action if warranted. In addition, retaliation against persons who make a good-faith report of harassment or

participate in investigations of harassment is prohibited and will not be tolerated."

35.     DOL has promulgated the U.S. Department of Labor Manual Series (DLMS) regulations
        regarding preventing harassing conduct, which states that it is "intended to assure that the
        Department of Labor is taking all necessary steps to prevent sexual harassment and other
        forms of harassing conduct in the workplace, and to correct harassing conduct that does
        occur before it becomes severe or pervasive;" and that "In the usual case, a single
        utterance of an ethnic, sexual, or racial epithet that offends an employee would not be
        severe enough to constitute unlawful harassment in violation of Title VII; however, it is
        the Department's view that such conduct is inappropriate and must be stopped." The
        DLMS requires DOL to promptly investigate any allegations of discrimination and/or
        harassment under the policy.

36.     DOL is required to comply with the Due Process Clause of the United States Constitution
        regarding Mr. Hampton's employment. The Due Process Clause prevents a government
        entity, including DOL, from applying laws and/or regulations that did not exist at the
        time of the acts in question retroactively, and/or including making a new "arbitrary
        choice" about a standard to apply, and applying it retroactively to an employee.

37.     Pursuant to 5 U.S.C. § 2301, DOL is required to abide by the federal government's Merit
        System Principles.

**Race Discrimination at DOL, and Mr. Hampton's Complaints About The Same**

38.     During the course of his employment at DOL, Mr. Hampton has observed DOL engaging
        in widespread and systematic discrimination against Black attorneys, including himself.

39.     Mr. Hampton has raised complaints about discrimination against himself and/or other
        Black attorneys, including the following:

10

a. DOL fails to hire Black attorneys, and also fails to support them in their employment, ultimately resulting in ending or damaging their careers with DOL.

b. There are only a handful of Black attorney managers (no more than six) in SOL nationwide out of a total of approximately 600 attorneys.  There are significantly fewer Black managers in SOL in regions where the management is White.

c. SOL's National office has over 300 lawyers, yet only three are Black and only one is an attorney manager.  For approximately the past four years Mr. Hampton was the only Black man in a supervisory attorney role in all of SOL. Upon information at belief, at the present, due to Mr. Hampton's termination, there is not a single Black male supervisory attorney in all of SOL.

d. DOL subjects Black attorneys and managers to investigations based on specious allegations of misconduct that were based on bias and/or were pretext for discrimination, such as complaints from White employees about the Black attorneys and managers being too overbearing, and for exercising basic managerial roles such as assigning work and making litigation decisions. In the past five years, DOL has made every Black manager working in Region III the subject of investigations due to complaints by their White subordinates.

e. DOL engages in race discrimination in the Honors Attorney Program. The DOL Honors Attorney Program is a two-year program which hires recent law school graduates, and provides the selected Honors Attorneys with training and opportunities within different divisions of DOL. At the end of the two years provides the Honors Attorney with a permanent position within DOL. Mr. Hampton observed, and complained, that the Honors Attorney Program engaged

in discrimination, as it disproportionately recruited White attorneys. Mr. Hampton also complained that the White Honors Attorneys received preferential treatment to Black attorneys not hired through the Honors Attorney Program, even when the performance of the Black attorney was superior to that of the White Honors Attorney.

f.   While DOL awards White attorneys for showing skills like trial advocacy, leadership, and obtaining victories for DOL, DOL penalizes Black attorneys for the same traits, labeling them with negative stereotypes such as "aggressive," "intimidating," "confrontational," "gruff," and "overbearing," or words to that effect.

g.   Certain White employees repeatedly objected to receiving direction from a Black supervisor, while not objecting to direction from non-Black managers. DOL was on notice of this, but DOL failed to take steps to investigate, prevent and/or correct this harassment and discrimination, and ratified the same.

40.   Mr. Hampton repeatedly complained to management about the harassment and discrimination against himself and other Black attorneys at DOL, including to Stanley E. Keen, the current Deputy Solicitor for Regional Enforcement, who previously held the position of Deputy Solicitor for National Enforcement. However, Mr. Keen and the DOL failed to take steps to prevent and/or correct the discrimination.

41.   Mr. Hampton's complaints directly implicated Mr. Keen due to Mr. Keen's roles in hiring, promotions, and retention of attorneys in DOL, including in the Attorney Honors Program, and DOL's handling of EEO complaints.

42.     In around August and September 2021, Mr. Hampton raised his complaints about

        systematic discrimination at the DOL with the newly confirmed Solicitor of Labor,

        Seema Nanda. Mr. Hampton asked Solicitor Nanda for DOL to produce data regarding

        the numbers of Black attorneys at DOL to further demonstrate the discrimination issues

        within the Agency. Mr. Keen was aware that Mr. Hampton had raised these complaints

        with Solicitor Nanda. Despite his complaint to Solicitor Nanda, nothing was done to

        investigate, prevent, or correct the harassment or discrimination. DOL declined to

        produce the data. Instead, DOL retaliated against Mr. Hampton for his complaints, and

        subjected him to discrimination based on his race.

### DOL Promotes Stanley Keen as Mr. Hampton's Supervisor

43.     In March 2021, DOL promoted Stanley Keen to the role of Deputy Solicitor for Regional

        Enforcement, making him Mr. Hampton's direct supervisor.

44.     As the Deputy Solicitor for Regional Enforcement, Mr. Keen reports directly to the

        Solicitor of Labor, Seema Nanda. As the Deputy Solicitor for Regional Enforcement, Mr.

        Keen holds one of the highest non-political appointee employee positions within DOL.

45.     As the Deputy Solicitor for Regional Enforcement, Mr. Keen conducts Mr. Hampton's

        performance reviews, determines his pay raises and/or bonuses, has the authority to

        discipline Mr. Hampton, as well as makes decisions regarding the staffing and other

        resources allocated to Mr. Hampton and his Region.

46.     Mr. Keen has repeatedly evidenced his animus towards Black attorneys and their

        complaints, including Mr. Hampton.

47.     Mr. Keen engages in disparate treatment of Black employees compared to White

        employees. For example, Mr. Keen micromanages the pleadings and strategy for cases

brought by Black attorneys, while not doing the same to White attorneys. Mr. Keen is dismissive of legal analyses presented by Black attorneys, while not doing the same for White attorneys. Mr. Keen has limited experience with litigation, often less than the Black attorneys whose work he is reviewing. There is no legitimate, non-discriminatory reason for Mr. Keen's micromanagement, dismissiveness and/or disparate treatment towards Black attorneys.

48.    Mr. Keen also accused Mr. Hampton of being "overbearing," "angry" and "aggressive" when he pursues litigation, an accusation Mr. Keen does not level against White managers. Mr. Keen made the same accusations about other Black attorneys.

49.    Mr. Hampton is informed and believes that Mr. Keen expressed animosity about allegations that he has discriminatory bias towards Black employees.

50.    Mr. Keen has refused to follow directions from Solicitor Nanda about addressing allegations of discrimination against Black employees. In or around September 2021, Mr. Hampton raised a concern to Mr. Keen and Solicitor Nanda about a Black attorney manager who was being subjected to discrimination. Solicitor Nanda directed Mr. Keen to have the matter investigated. Mr. Keen did not follow Solicitor Nanda's directions, and the matter went uninvestigated and unremedied.

51.    When Mr. Keen assumed his new role as DOL's Deputy Solicitor for Regional Enforcement, he began his campaign to remove Mr. Hampton.

**Mr. Keen Accepts Biased, Unfounded Complaint against Mr. Hampton, and Ratifies Discrimination Against Mr. Hampton**

52.    With Mr. Keen promoted to the role of Deputy Solicitor for Regional Enforcement, select White employees who had long harbored resentment towards Mr. Hampton because of his race now had a new audience for their unfounded and biased complaints.

14

53.   In October 2021, Judson Dean, a White attorney who worked under Mr. Hampton, reached out to Mr. Keen to complain about Mr. Hampton. Mr. Keen and Mr. Dean had a series of calls where Mr. Dean complained about Mr. Hampton and two Black female attorney managers. Mr. Keen's notes record that Mr. Dean **referred to the Black female attorney managers as Mr. Hampton's "flying monkeys"** and leveled unfounded accusations that these Black attorneys, including Mr. Hampton, were incompetent.

54.   Referring to Black people as monkeys is a well-known dehumanizing racist slur. Despite this, neither Mr. Keen, nor anyone at the DOL took steps to investigate, prevent and/or correct this discriminatory conduct, in violation of DOL policies.

55.   Mr. Dean later complained that Mr. Hampton "just powers over people. Oscar [Hampton] is physically imposing and has one of the deepest and loudest voices," invoking the racist stereotype that Mr. Hampton was a big, scary, Black man.

56.   Mr. Dean accused Mr. Hampton of being "not even a skillful attorney." Mr. Keen knew and/or should have known that this allegation was unfounded, and was belied by Mr. Hampton's impressive litigation record of jury trial victories, and belied by the fact that through Mr. Hampton's leadership Region III far surpassed other DOL Regions' recoveries for workers. Mr. Keen also knew and/or should have known that despite Mr. Dean's title of "Senior Trial Attorney" at DOL he had very limited trial experience, having done approximately four trials in his over 20 years at DOL.  Mr. Keen also knew and/or should have known that after Mr. Dean's most recent trial victory, he had publicly thanked Mr. Hampton for his mentorship, and publicly stated that Mr. Hampton "made me a better attorney" or words to that effect. Nonetheless, Mr. Keen uncritically accepted Mr. Dean's allegations, and did not question their credibility and/or their biases.

57.     Mr. Dean similarly alleged to Mr. Keen that a Black female attorney manager in Region

III was "objectively speaking, is an unacceptably terrible attorney." Mr. Keen knew

and/or should have known that this allegation was unfounded, and was belied by the

attorney's victories for DOL. Mr. Keen also knew and/or should have known that despite

Mr. Dean's title of "Senior Trial Attorney" at DOL he had very limited trial experience,

having done approximately four trials in his over twenty years at DOL. Mr. Keen knew

and/or should have known that the Black attorney that Mr. Dean  accused of being

"objectively speaking, [] an unacceptably terrible attorney," had an impressive record of

accomplishments for DOL, including winning the third highest wage and hour victory in

DOL's history.  Mr. Keen was also aware of Mr. Dean's racist reference to the Black

attorney managers who worked under Mr. Hampton as Mr. Hampton's "flying moneys."

Nonetheless, Mr. Keen uncritically accepted Mr. Dean's allegations, and did not question

their credibility and/or their biases.

58.     Mr. Dean asked Mr. Keen to terminate Mr. Hampton, asking "[i]s removal realistic?" Mr.

Keen responded that he "had no way to guarantee immediate results."

59.     Rather than investigate the Mr. Dean for his overt racist language, Mr. Keen asked Mr.

Dean to solicit complaints from additional attorneys about Mr. Hampton to support this

discriminatory and retaliatory investigation into Mr. Hampton.

60.     On October 12, 2021, Solicitor Nanda received an anonymous letter claiming to be from

an attorney in Region III, which she then provided to Mr. Keen. The letter made

complaints about Mr. Hampton similar to those made by Mr. Dean. The letter mirrored

the substance and language of an anonymous complaint filed against Mr. Hampton in

2018, which DOL investigated and found to be unsubstantiated and that Mr. Hampton

had engaged in no wrongdoing. Nonetheless, Mr. Keen decided the anonymous letter was a basis to subject Mr. Hampton to an investigation.

**Mr. Keen Makes Unfounded, Biased, Decision to Attribute Negatives in Survey Results to Mr. Hampton**

61.    Mr. Keen interpreted the results of DOL's nationwide 2020 Federal Employee Viewpoint Survey (FEVS) with bias against Mr. Hampton, attributing all negative feedback as evidence of Mr. Hampton engaging in misconduct. There was no legitimate nondiscriminatory reason for Mr. Keen's biased interpretation of the survey results. Mr. Keen used his biased interpretation of the results to take action against Mr. Hampton, including subjecting him to an investigation.

62.    On or around August 23, 2021, Mr. Keen received the FEVS results. When Mr. Keen received the FEVS results, he made the unfounded and biased decision to interpret negative employee feedback in the FEVS as attributed to Mr. Hampton, and Mr. Hampton alone. There was no legitimate, non-discriminatory reason for Mr. Keen's conclusions. Mr. Keen used his interpretation of the FEVS results as part of his basis for launching an extended investigation into Mr. Hampton, and Mr. Hampton alone.

63.    The FEVS is a nationwide organizational climate survey that the U.S. Office of Personnel Management (OPM) conducts across all federal agencies nationwide. The FEVS uses multiple choice questions and/or Likert scale questions, and does not request that employees identify the specific managers and/or entities that they are referencing in their answers.

64.    One of the questions in the FEVS survey asked employees whether they felt they "can disclose a suspected violation of any law, rule or regulation without fear of reprisal."

65. Out of the six regions within DOL, the one with the highest negative response to the question about reprisal was San Francisco, followed by Philadelphia. In San Francisco, fourteen employees responded to the FEVS, of which 57.5% responded in the negative, 35.3% neutral, and 7.1% positive. In Philadelphia, 14 employees responded to the FEVS, of which 54.6% responded in the negative, 22.7% neutral, and 22.7% positive.

66. Mr. Keen reviewed the results of the FEVS and professed to be "concerned" and "disturbed" about the fear of reprisal in the Philadelphia Region, and the Philadelphia Region alone. Mr. Keen attributed the fear of reprisal to Mr. Hampton and Mr. Hampton alone. Mr. Keen decided to conduct an investigation into Mr. Hampton, but did not scrutinize and/or investigate the leadership of the San Francisco Region (or any other DOL Region), even though the FEVS showed higher rates of employees in San Francisco stating that they feared reprisal. The Regional Solicitor for San Francisco was White.

67. The rates of fear of reprisal expressed on the 2020 FEVS across DOL had gone up since the previous FEVS, and were higher than the rates of fear of reprisal expressed by other federal agencies. Mr. Keen did not launch an investigation into any other component of DOL, nor any other DOL managers for the reported increased fears of reprisal, just Mr. Hampton.

68. At the same time that Mr. Keen attributed the FEVS results to misconduct by Mr. Hampton, DOL was openly taking a contrary position about the reasons DOL employees reported fearing reprisal. The Agency and its new leadership understood that much of the fear of retaliation raised by employees was due to conduct that occurred under the Trump administration. Solicitor Seema Nanda held meetings with DOL employees where she discussed this openly, and the steps that the new administration was taking to rectify this.

Mr. Keen was present at these meetings, and knew and/or should have known of the same. Nonetheless, Mr. Keen interpreted the FEVS results as evidence of Mr. Hampton, and Mr. Hampton alone, creating a fear of reprisal. Solicitor Nanda was aware of Mr. Keen's actions and the basis for the same, but did not take action to stop Mr. Keen's discriminatory conduct towards Mr. Hampton.

69.     The high rates of fear of reprisal in the DOL FEVS survey garnered media attention. For example, on November 15, 2021, Bloomberg News wrote an article entitled "Top Labor Agency Lawyer Responds to Staff's Whistleblowing Fears," referencing Solicitor Nanda. The subtitles of the article were "One in four DOL regional attorneys reported concerns in 2020" and "Solicitor of Labor pledges to address problem, promote equity." The Bloomberg article reported that "[t]he responses reflect an employee morale issue during the Trump administration's final year-a time when the White House and federal agencies routinely attempted to erode civil service protections for federal workers."

70.     Events under the Trump administration that gave SOL employees a reason to state in the FEVS that they feared reprisal included when DOL removed Regional Solicitor Janet Herrold after she objected to DOL making decisions about litigating a case that she believed favored a political donor, and were not based on the merits. In addition, there were incidents where political appointees under the prior administration interfered with Region III attorneys' ability to litigate and/or resolve cases. As the DOL Region which encompasses Washington, DC, DOL Region III had the most interaction with DOL's headquarters and political appointees of any DOL Region. Mr. Keen knew and/or should have known about these bases for Region III employees fearing retaliation. Still, he

interpreted the fear of retaliation expressed in the FEVS as attributable solely to Mr. Hampton.

71.    Mr. Hampton himself responded in the FEVS that he feared reprisal, and this was in reference to the prior administration. Mr. Hampton had particular reasons to state on the FEVS that he feared reprisal because of reprisal he had personally experienced under the prior administration, and the reprisal he had observed against others.

72.    At least two attorneys testified that they believed the fear of reprisal reflected in the FEVS was due to the prior administration. Upon information and belief, at least three attorneys other than Mr. Hampton in Region III responded that they too feared reprisal due to their experiences under the prior administration. In short, based on the data in the FEVS survey, approximately seven attorneys in Region III stated that they feared reprisal, and at least four of them provided this answer due to the conduct of the prior administration, and not due to Mr. Hampton. Nonetheless, Mr. Keen concluded that these results were about Mr. Hampton, and Mr. Hampton alone.

73.    Mr. Keen accused Mr. Hampton of creating a fear of retaliation in his office based on the FEVS results. When Mr. Hampton met with Mr. Keen, Mr. Hampton stated what he believed the FEVS results reflected: that employees voiced a fear of retaliation due to the prior administration; that the question encompassed fear of reprisal from any part of DOL leadership, including DOL headquarters, and could not be blanketly attributed to Mr. Hampton; and that the small response rate of fourteen out of forty five employees was not representative of the office. Mr. Keen rejected Mr. Hampton's explanations without justification, and determined that Mr. Hampton's response was improper and evidence that Mr. Hampton had an "apparent failure … to recognize the fear of retaliation or

reprisal." Mr. Keen did not do the same to any other Regional Solicitor, including in the Region that had a higher rate of fear of reprisal than Mr. Hampton's Region.

74. There was no legitimate, non-discriminatory reason for Mr. Keen to determine that Mr. Hampton, and only Mr. Hampton, created a fear of retaliation amongst his employees. Nonetheless, Mr. Keen decided to subject Mr. Hampton to an investigation for the same.

## Mr. Keen Launches an Investigation into Mr. Hampton

75. Due to Mr. Keen's referral, DOL conducted a lengthy investigation into Mr. Hampton, spanning *over two years*, from December 2, 2021 through March 16, 2023. Under the DOL policy the investigation was conducted under, the investigation was supposed to conclude within 90 days. The investigation was made known to nearly all employees within DOL Region III, as well as many former employees of DOL Region III. The investigation investigated topics alleged by Mr. Dean and Mr. Keen, as well as allegations that White attorneys in Region III previously made against Mr. Hampton which DOL had investigated and had found to be unfounded. The topics investigated included whether Mr. Hampton created a toxic work environment, undermined the mission of DOL, created a fear of retaliation. It also explicitly investigated Mr. Hampton for his criticisms of the Honors Attorney Program, which were Mr. Hampton's protected complaints about discrimination in the DOL Honors Attorney Program.

76. The investigation also examined "whether Mr. Hampton is the reason attorneys are leaving Region 3." At the beginning of the investigation, Region III had comparable attrition rates to at least two other DOL Regions, however, DOL did not investigate these Regions and/or their Regional Solicitors, both of whom were White. DOL investigated concerns about the White attorneys who had departed from Region III. DOL ignored the

Black attorneys who had departed. Mr. Hampton is informed and believes that many of the Black attorneys who departed DOL decided to leave due to the race discrimination they experienced. There was no legitimate, non-discriminatory reason for this.

## Employees Testified Against the Allegations Made Against Mr. Hampton, but DOL Ignores their Testimony

77.     During the investigation, employees repeatedly testified about Mr. Hampton's excellent performance, dedication to DOL's mission, good management, and positive treatment of employees, and that Mr. Hampton did not create a fear of retaliation. Employees also testified about the explicit racism they had observed towards Mr. Hampton. Eight out of nine managers in Region III testified in favor of Mr. Hampton. The testimony of all the other managers, as well as other employees, no matter how positive, was ignored.

## Employees Testified that DOL was Subjecting Mr. Hampton to Discrimination, but DOL Ignored these Allegations

78.     In DOL's investigation, multiple employees provided sworn testimony about the specific racism that they observed Mr. Hampton being subjected to.

79.     DOL has an obligation to investigate allegations of discrimination that are raised, but DOL did not investigate any of the allegations from employees that Mr. Hampton was being subject to discrimination.

80.     Examples of sworn testimony from employees about the racism towards Mr. Hampton includes the following:

    a.  One senior Black manager testified about the racism she observed DOL subjecting Mr. Hampton to, and observations about White attorneys undermining the authority of managers of color in DOL. She testified that at DOL, she "was **met with open hostility and insubordination and that is the experience I have**

22

**heard with other managers of color in the Department.**"  She also testified that DOL management openly discouraged Honors Attorneys from applying to work in Mr. Hampton's region, and that they thought this was **due to the fact that the leadership was Black.** She testified that an Honors Attorney told her he "heard that Region 3 Solicitor's Office has a reputation for being a difficult office to work for or in." In her sworn testimony she stated that she thought this reputation was due to "a combination of things like **conscious and unconscious bias, institutional racism**, and the fact that we litigate a lot."

b. A White male attorney, provided sworn testimony about the racism he observed DOL subjecting Mr. Hampton to, including weaponizing professional disagreements into allegations that the Black professional had behaved unethically. He testified that "**Its my perception that people who disagree with black professionals use ethics as an attack to undermine their position**, and I have observed people do that in unrelated contexts. "If you do something that I disagree with you are being unethical." Mr. Hampton is Black, [White junior attorney who complained about Mr. Hampton] is White, and it was my perception that [White junior attorney's] **allegation may have been motivated in part by racial prejudice**." He testified about the racist conduct he observed towards Elizabeth Kuschel, a Black trial senior attorney, including by the same White attorneys who complained about Mr. Hampton.

c. A Black female Senior Trial Attorney in the Philadelphia office provided sworn testimony about the racism she observed DOL subjecting Mr. Hampton to, including making the following statements under in her sworn affidavits:

    i.  "**I think [Mr. Hampton] gets a lot more push back than they would give a White attorney.** The push back that I see the attorneys give to Oscar is different from what I would expect them to give a White attorney…. "I don't see Oscar playing favorites, however **what I do see is people treating Oscar in a way that I don't think they would treat a White/White manager**," and provided specific examples of a junior White attorney refusing to follow directions in a case. (emphasis added).

    ii.  "<u>All I see is Oscar asking people to do their job and they just don't do it.</u> Not doing your job has become the routine, **I don't think this would happen if there was a White manager.** From what I can see it happens all the time."

    iii.  " [A] **lot of my colleagues are not used to being in a place where a black person is equal to them which causes them to feel a certain way**"

    iv.  **There's a very strong anti-black sentiment and it didn't start with Oscar."**

    v.  She testified that in the office she observed the **"hyper surveillance of the black attorneys by the White attorneys."**

    vi.  She testified that there was a "**hostile work environment that the White attorneys have created**."

81.    Nonetheless, DOL issued a 173 page Report of Investigation (ROI) that failed to cite *any* of the witnesses' testimony about the racism against Mr. Hampton.

82.    The DOL Report of Investigation (ROI) concluded that "[t]he investigation did not reveal racial bias by White attorneys in Region 3."

83.     DOL used the investigation and the Report of Investigation as a basis to discriminate against Mr. Hampton, and remove him from his position.

**DOL Receives Other Complaints About Race Discrimination Towards Mr. Hampton and/or Others, But DOL Ignores and Refuses to Investigate**

84.     DOL has an obligation to investigate any complaints of discrimination it becomes aware of, and to take action to ensure such discrimination stops. However, DOL repeatedly refused to investigate and/or take action regarding complaints about race discrimination at SOL, including against Mr. Hampton, as alleged herein.

85.     The Black female Senior Trial Attorney in the Philadelphia office testified that on or around March 6, 2023, she and a White attorney complained to DOL's Diversity, Equity, and Inclusion ("DEI") officer about racist conduct to herself and other Black employees at DOL, including Mr. Hampton. In response, the DEI officer stated "what do you want me to do about that. I can't train that away. All I can offer is training." DOL did nothing to investigate and/or remedy these complaints.

86.     In March 2023, a Black Senior Trial Attorney in Region III departed DOL. Prior to departing, she wrote a detailed email complaining about the racism that she had experienced at DOL, and that she observed DOL subjecting other Black attorneys to, including Mr. Hampton. She also complained that a group of White attorneys got together to take action to resist the Black managers, and to coordinate their responses to the DOL's ongoing investigation into Mr. Hampton. DOL did nothing to investigate and/or remedy these complaints. To the contrary, Mr. Keen used the fact that this group of attorneys had gotten together to take action as evidence against Mr. Hampton.

87.     In November 2022, a senior DOL attorney complained about the publicly humiliating way that DOL removed Mr. Hampton from his role of Regional Solicitor, describing it as

a "lynching," and complained about discrimination against Mr. Hampton and other

employees of color at DOL. DOL did nothing to investigate and/or remedy these

complaints.

### DOL's Investigation Also Ignored Testimony that Employees Thought Mr. Hampton was an Excellent Employee

88.    Contrary to the allegations leveled against him, in the investigation, DOL employees

testified to Mr. Hampton's excellent performance, dedication to DOL's mission, good

management, and positive treatment of employees, and that the employee complaints

about Mr. Hampton were unfounded and/or were based on racial bias. Employee

testimony praising Mr. Hampton includes the following:

    a.    One White female manager described her "working relationship with [Mr.

       Hampton] is excellent." she described Mr. Hampton as "<u>very passionate about our</u>

       <u>mission of protecting the employees</u>. Things like large monetary awards mean

       that employees that have been illegally deprived of their wages are now being

       compensated. He is proud of all success large or small. I think all Regional

       Solicitors would be proud of that. Oscar is also very proud of the smaller cases

       when we have successful results. For instance, in my program area, MSHA, the

       penalties are often small." She testified that Mr. Hampton "is very passionate

       about the mission of the Department," and that Mr. Hampton "cares about

       excellence, we have a mission, and we need to do our best to fulfill it." She

       testified that "<u>I feel I am really respected by Mr. Hampton</u>, even though he has

       known the others longer. From our managers' meetings, he is respectful of all the

       others as well." She further described the work environment under Mr. Hampton

       by testifying "I have been in staff meetings when we introduce ourselves to new

attorneys, and Oscar always adds something positive or a compliment about that attorney. He praises staff all the time and I appreciate that. I feel that Oscar is very supportive, and I personally feel like I can speak with him, and he listens."

b.   A White male manager testified "I don't know why they would fear reprisal. <u>I have never experienced anything that would make me think that I or anyone else should fear reprisal.</u>" He further testified that "I do not have any specific concerns with Mr. Hampton's performance or conduct as the Regional Solicitor. <u>I do feel that he is being treated unfairly by certain attorneys.</u>" DOL did not investigate this allegation.

c.   A senior White male attorney also spoke highly of Mr. Hampton and his dedication to the DOL's mission in his sworn testimony, stating <u>"[m]y perception is that his number one concern is workers' safety and their wellbeing</u>. MSHA and OSHA cases are looked at with priority because people are getting killed or at risk of serious harm or injury, that's what's important to him. When it comes to Wage and Hour cases, I perceive him to display an appropriate concern for higher recovery cases as compared to lower recovery cases. I would say he values high dollar FLSA cases in the sense that he wants to recover as much as possible for workers who have been victims of wage theft, and in the sense that significant recoveries can have a greater deterrent effect on potential bad actors. He always encourages people to get the most they can legally and appropriately get and not leave wages owed to workers on the table without good reason."

d.   A Black female manager testified that Mr. Hampton as "very efficient, mission driven, and he leads by example. I think it is easy working with Oscar, you know

that strategy and decision making. <u>He has a lot of experience in litigation, and it is very helpful when it comes to strategies</u>. He is predictable because <u>he is so mission driven that you know what the goal is and that's to make sure the workers are protected as much as possible</u>. As long as we are following the laws and following the rules, then it is our obligation to do our very best to protect the workers. He is open to growing and learning and into growth mentality."

e.  A Black female Senior Trial Attorney in the Philadelphia office gave sworn affidavit testimony about Mr. Hampton's excellent performance and contributions to DOL include the following:

    i.  She testified that Mr. Hampton was "a demanding supervisor, not more or less demanding than he should be. I have worked in a private sector before my employment with DOL and I would say that Oscar is on par with other managers that I have had in my previous positions. The job itself is demanding, he is kind to people, and when mistakes are made, he does not throw the staff member under the bus, he takes the heat as a leader, which are signs of a good leader. He always compliments the staff during staff meetings, something I didn't see in my previous positions."

    ii.  She testified that Mr. Hampton "is all about the [DOL's] mission. He frequently says we need to be working to get people every single dollar that they are owed. <u>Oscar is all about pursuing every single last dollar and doing what is in the best interest of the employees</u>."

    iii.  When asked "[h]ave you ever witnessed Mr. Hampton disrespect any employee? Talk down or treat that employee with disrespect?" she

testified "No, however **I have seen the trial attorneys disrespect Mr.**

**Hampton**," and  "**I haven't seen Oscar demean an attorney, but the**

**attorneys undermine Oscar**." *Id.*

iv. She also testified "I consider Oscar my mentor, so there have been times

where I will go to Oscar and ask his advice on dealing with certain

managers or a situation, but there's nothing inappropriate about the

conversation. It's what I would expect from a supervisor or mentor on how

to deal with situations."

v. She also testified "As an attorney we have an ethical obligation to

"zealously" represent the client and be passionate about the workers and

the cases that we represent. On the [court] case, I have seen [Mr.

Hampton] be appropriately zealous of the issues and the amount at stake. I

have not had any issues."

f. A White male manager also provided sworn affidavit testimony about Mr.

Hampton's excellent performance and contributions to DOL include the

following:

i. Regarding how Mr. Hampton treats attorneys, he testified that "He likes

attorneys who work hard, and that would gain you favor. He likes

attorneys who place the interest of the people who we are trying to protect

through the Wage and Hour laws and the health and safety, anti-

discrimination laws, and the wellbeing of American workers over our

personal interests," and that "If you are doing well in your program areas,

he will back you up and support you. He like to win; and we win. We have

an impressive region; our attorneys work hard and get excellent results. I
admire them."

ii.   He testified that he "[a]bsolutely [does] not" fear reprisal.

iii.   When asked if Mr. Hampton is "too demanding," he testified "Sometimes
I do. But we are trial attorneys, and if we were to work only 40 hours a
week, we wouldn't get everything done that we need to do our jobs. We
would not be able to file complaints; we would not be able to send out
discovery; we would not be able to conduct or defend depositions; we
would not be able to draft pleadings or arguments for court. It is the nature
of the beast. Trial work can be very confrontational, very demanding of
people's time. There are deadlines that are imposed by the courts that can
be very short."

iv.   He further testified that "He does not want people to settle cases that may
be due to the convenience of the attorney. He has made that very clear to
managers and staff. He wanted to make sure that when you are cross
examining or presenting a closing argument that you make a point to make
it clear that the defendant needs to be found liable, liable for someone who
lost wages or lost a finger. It is a very effective advocacy tool. I think a lot
of attorneys have benefited by his style of litigation. He doesn't want the
staff to settle cases for less than what they are truly worth or to cozy up to
opposing counsel. He wants staff and managers to be assertive in our
litigation. The results in the last 5 years have been phenomenal. I
remember Oscar went to each client and told them that I am here for you,

<u>and they were happy to have an advocate."</u>

g.  Another attorney testified that he thinks Mr. Hampton "is a tough boss, but a good one. He has his own distinct management style and is very passionate about the work we do. He has always treated me nicely but is prone to interrupt during conversations. At bottom, I think he cares deeply about the office, the trial attorneys, and our mission."

h.  A senior White female attorney testified that "My morale is fine. I like my job and supervisors. I respect Oscar and the aggressive approach he takes to enforcement." She further testified that Mr. Hampton "really like recovering back wages and liquidated damages for workers [in FLSA cases]. He is very dedicated to the mission."

i.  A Black female attorney testified that under Mr. Hampton, there "is a good working environment, and the supervisors are supportive. When I came into the job, I did not have much civil litigation experience. The supervisors worked to get me the training I needed, and they implemented weekly check-ins. They always wanted to know what I needed to do my job. The[y] were very intuitive regarding what I needed. I think morale has been good."

89.  Nonetheless, DOL issued a Report of Investigation (ROI) concluding that as a manager, Mr. Hampton was "rude, unprofessional, condescending, professionally abrasive, negative, bombastic, overbearing, intimidating, hostile, disrespectful, quick to dismiss, belittling, demoralizing, gruff, aggressive, confrontational, and harassing." There was no legitimate, non-discriminatory reason for DOL to reach this conclusion.

### DOL Reduces Mr. Hampton's Bonus

90.    In 2022, DOL paid Mr. Hampton a reduced bonus and pay increase, while not doing the same to the other White Regional Solicitors. Mr. Hampton's performance and accomplishments for DOL warranted the same bonus as the other Regional Solicitors, if not a higher bonus, including the fact that he had recovered millions more for employees than these other Regional Solicitors. There was no legitimate, non-discriminatory reason to pay Mr. Hampton less than the other Regional Solicitors.

### DOL Removes Mr. Hampton from His Regional Solicitor Position

91.    On November 10, 2022, while the investigation into Mr. Hampton was ongoing, Mr. Keen issued Mr. Hampton a Notice of Detail and No Contact Order, publicly removing him from his position as Regional Solicitor for Region III, and assigning him to an unspecified position in DOL headquarters in Washington, DC.

92.    Mr. Keen announced DOL's decision to remove Mr. Hampton in a public meeting with Region III employees.

93.    Numerous attorneys protested removing Mr. Hampton from his position, and explained that there would be a serious negative impact on DOL's operations due to the important role Mr. Hampton played in DOL's active cases, and that Mr. Hampton's assistance and expertise were needed by DOL.

94.    One senior attorney compared the publicly humiliating way that DOL removed Mr. Hampton to a "lynching," and complained about discrimination against Mr. Hampton and other employees of color at DOL.

95.    In response to the employee outcry and protests, Mr. Keen reluctantly agreed to allow Mr. Hampton to work on the big *East Penn* case scheduled for an upcoming trial, while

insisting that he remain removed from his position, stripped of his managerial duties and prestige, and prohibited from having other contact with his employees.

96.   There was no legitimate non-discriminatory reason to remove Mr. Hampton from his position of Regional Solicitor. DOL's proffered reasons for doing so are false and/or pretext for discrimination.

97.   Mr. Keen's stated reason for removing Mr. Hampton from his position was that Mr. Hampton had retaliated against an attorney in his Region for participating in the investigation Mr. Keen had launched. However, this stated reason for removing Mr. Hampton was unfounded and pretext for discrimination. On its face, the attorney's complaint did not allege that Mr. Hampton had engaged in any conduct that would dissuade a reasonable employee from making or supporting a charge of discrimination, much less conduct that would warrant publicly removing Mr. Hampton from his role as Regional Solicitor and prohibiting his interactions with all employees. Moreover, the attorney's allegations contradicted her prior sworn testimony.

98.   The attorney filed her complaint with DOL on November 4, 2022. She alleged that Mr. Hampton had engaged in reprisal by inquiring about the investigation on February 28, 2022, and March 1, 2022. However, the allegations in her complaint directly contradicted the prior sworn affidavit that she had signed on April 28, 2022, as part of DOL's investigation, where she testified that to date she had experienced no reprisal.

99.   The attorney changed her story after she spoke to Mr. Keen. The attorney reached out to Mr. Keen on or around October 12, 2022, after she was counseled for her conduct by her supervising attorney on a case on or around October 6, 2022. The attorney contacted Mr. Keen upset about the counseling. After speaking with Mr. Keen, the attorney now alleged

that Mr. Hampton had retaliated against her back on February 28 and March 1, 2022, even though her more contemporaneous, previous sworn affidavit signed on April 28, 2022, contradicted these allegations, as there she had testified that she had not experienced any retaliation to date. On or around October 26, 2022, Mr. Keen referred her claims for an investigation. On January 20, 2023, the attorney signed a sworn affidavit with her new allegations, contradicting earlier testimony.

100.   It was against DOL policy for Mr. Keen speak to the attorney about her testimony in an open investigation, or otherwise interfere with the witness and/or the investigation. Under DOL policies, such conduct could warrant discipline. DOL was aware of Mr. Keen's conduct, but took no action to stop it, conducted no investigation, nor disciplined Mr. Keen.

101.   DOL knew and/or should have known that the attorney's new complaint contradicted her prior testimony. DOL knew and/or should have known that the attorney's complaint did not allege that Mr. Hampton had engaged in any conduct that would dissuade a reasonable worker from making or supporting a charge of discrimination. Nonetheless, DOL kept Mr. Hampton out of his position of Regional Solicitor, detailed to the Washington, DC office, and prohibited from interacting with his staff except for his work on the big *East Penn* case.

102.   DOL kept Mr. Hampton detailed out of his position of Regional Solicitor, and enforced the No Contact Order prohibiting his contact with other employees, even after the investigations had concluded, and even after the attorney who made the complaint departed from DOL.

103. DOL kept Mr. Hampton detailed out of his position of Regional Solicitor, and enforced the No Contact Order prohibiting his contact with other employees up through and even after Mr. Hampton won the *East Penn* case, garnering the highest jury verdict in the history of DOL, and garnering praise from Solicitor Seema Nanda.

104. DOL continued to keep Mr. Hampton detailed out of his position of Regional Solicitor, and enforced the No Contact Order until DOL terminated his employment on September 12, 2023. To date, the position of Regional Solicitor for Region III remains vacant. There was no legitimate non-discriminatory reason for DOL's actions towards Mr. Hampton. The allegations DOL made against Mr. Hampton are unfounded, false, and/or pretext for discrimination. Any reasons proffered for DOL's treatment of Mr. Hampton are unfounded, false, and/or pretext for discrimination.

## **Impact of the Discrimination**

105. Mr. Hampton served DOL for 37 years. In that time, he made monumental contributions to the mission of the Agency and the nation's workers, including winning the biggest jury verdict in the Agency's entire history. His accomplishments are impressive by any standard. An Agency not driven by discriminatory animus would have treated him with gratitude and respect. Instead, DOL allowed employees and managers with racial animus to engage in this discrimination against Mr. Hampton.

106. DOL's discriminatory actions towards Mr. Hampton inflicted financial, reputational, personal, and emotional harm on him. DOL must rectify this discrimination.

107. DOL's discrimination against Mr. Hampton also harms the mission of the Agency and the nation's workers whom the Agency has a fiduciary duty to protect.

108.   DOL's conduct towards Mr. Hampton sends a message that DOL tolerates and ratifies

discrimination, and further sends a chilling message to DOL employee about engaging in

protected activity. DOL's conducting an over two-year long investigation into Mr.

Hampton, which DOL made known to nearly all employees within DOL Region III,

would reasonably dissuade other employees from making protected complaints about

discrimination, especially when one of the explicit topics of DOL's investigation was

itself Mr. Hampton's protected complaints about discrimination in the DOL Honors

Attorney Program. DOL's refusal to investigate numerous independent complaints about

discrimination towards Mr. Hampton, and/or take remedial actions regarding the same,

sends a chilling message regarding DOL's refusal to provide employees with the

protections of the anti-discrimination laws and policies that DOL is governed by. DOL's

discrimination against Mr. Hampton sends a chilling message to DOL employees that

discrimination and/or retaliation will be tolerated and ratified, and that neither the most

impressive accomplishments for DOL, nor having numerous employees testify to

corroboration the discrimination, nor having numerous employees testify to corroborate

your excellent performance, will be sufficient to protect DOL employees from

discriminatory and/or retaliatory animus at DOL.

## STATEMENT OF CLAIMS

### Count I
### Race and/or Sex Discrimination
### (Title VII, 42 U.S.C. § 2000e-1 et seq.)

109.   Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set

forth in this Count.

110. Discrimination because of an employee's race and/or sex is unlawful under Title VII, 42 U.S.C. § 2000e-1 *et seq.*

111. As a Black man, Plaintiff is the member of a protected class.

112. Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and to investigate and then to remedy the situation if discrimination occurs.

113. Defendant has a known history of granting preferential treatment to White employees and treating Black employees worse, and subjected Mr. Hampton to this discrimination as well.

114. Defendant subjected Plaintiff to mistreatment because of his race and sex, including removing him from his position, making false and/or unsubstantiated allegations against him, subjecting him discriminatory to investigations, interfering with his ability to carry out his duties on behalf of DOL, and tarnishing his professional reputation. DOL accepted and ratified racist, biased, and unfounded allegations against Mr. Hampton, and subjected him to racist, biased stereotypes. Defendant did not subject White employees to similar treatment. There was no legitimate, nondiscriminatory reason for Defendant's treatment of Plaintiff.

115. DOL's discriminatory actions towards Mr. Hampton have inflicted financial, reputational, personal, and emotional harm on him.

**Count II**
**Retaliation**
**(Title VII, 42 U.S.C. § 2000e-1 et seq.)**

116. Plaintiff incorporates by reference all prior paragraphs to this Complaint, as if fully set forth in this Count.

117. Retaliation because of an employee's complaints of discrimination is unlawful under Title VII, 42 U.S.C. § 2000e-1 *et seq.*,

118. Defendant qualifies as an employer under Title VII, and thus, Defendant has a legal obligation to provide Plaintiff and all employees a workplace free of unlawful discrimination and retaliation and to investigate and then to remedy the situation if discrimination occurs.

119. Plaintiff made protected complaints of discrimination, including discrimination against himself, and opposing discriminatory treatment of others.

120. Defendant retaliated against Plaintiff for his protected complaints of discrimination, including removing him from his position, making false and/or unsubstantiated allegations against him, subjecting him discriminatory to investigations, interfering with his ability to carry out his duties on behalf of DOL, and tarnishing his professional reputation. There was no legitimate, nondiscriminatory reason for Defendant's treatment of Plaintiff.

121. DOL's discriminatory actions towards Mr. Hampton have inflicted financial, reputational, personal, and emotional harm on him.

**RELIEF REQUESTED**

122. WHEREFORE, Plaintiff Mr. Hampton demands judgment against the Defendant and prays that the Court:

A. A Declaratory judgment that Defendant's conduct violated Mr. Hampton's rights;

B. Order Mr. Hampton's reinstatement to his position of DOL Regional Solicitor;

C. Award Mr. Hampton compensatory damages;

D. Award Mr. Hampton all pay he lost as a result of the discrimination;

E. Award Mr. Hampton the out-of-pocket costs and consequential damages he incurred as a

result of Defendant's discrimination against him;

F.  Award Mr. Hampton reasonable attorney's fees and the costs of this litigation, including the fees and costs incurred in representing Mr. Hampton in the internal DOL investigations and administrative process;

G.  Award Mr. Hampton appropriate prejudgment and post-judgment interest;

H.  Award Plaintiff an addition amount to account for any taxes he may be called upon to pay in relation to these awards herein;

I.  Enjoin the Defendant from discriminating against, retaliating against, or harassing Mr. Hampton in any manner;

J.  Order Defendant to develop and implement effective measures to prevent and then remedy discrimination and retaliation;

K.  Order Defendant to conduct an effective assessment of its current anti-discrimination procedures and policies in place, including investigations into allegations of discrimination raised, to determine how effective or ineffective they are;

L.  Order the Defendants to conduct an effective assessment of the actual practices and making use of the Defendants' existing anti-discrimination policies and procedures, including investigations into allegations of discrimination raised, in order to determine why they did not work in relation to Plaintiff and making changes so that in the future they will work;

M.  Order Defendant to consider appropriate disciplinary actions against the management officials who engaged in discrimination and/or retaliation against Plaintiff;

N.  Posting of notices on Defendant's premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations

may not be subject to retaliation; and

O.  Award such other relief as may be necessary and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues triable by a jury pursuant to Fed. R. Civ. P. 38.

Dated: November 7, 2023.

JOSEPH, GREENWALD AND LAAKE, PA

__ **/S/ MICHAL SHINNAR** _____
Michal Shinnar
DC USDC No. MD0033
*Senior Counsel*
Joseph Greenwald & Laake, PA
MShinnar@jgllaw.com

**/S/   JAY P. HOLLAND** _____
Jay P. Holland
DC USDC Bar. No. 422258
*Partner*
Joseph Greenwald & Laake, PA

JHolland@JGLLAW.com
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770

Tel. 301.220.2200
Fax. 301.220.1214
*Attorneys for Plaintiff*